132 So.2d 198 (1961)
Willard V. HALLAM, Appellant,
v.
Miriam H. GLADMAN, Individually and as trustee of the Estate of Mary V. Hallam, deceased, and as sole surviving tustee of W.F. Hallam & Company, a dissolved Florida corporation, Appellee.
No. 1518.
District Court of Appeal of Florida. Second District.
July 28, 1961.
*199 Jennings, Watts, Clarke and Hamilton, Jacksonville, and Holland, Bevis, McRae & Smith, Bartow, for appellant.
Macfarlane, Ferguson, Allison & Kelly, Tampa, for appellee.
KANNER, Judge.
Willard V. Hallam, appellant, asserting an interest in his mother's estate, sued his sister, Miriam H. Gladman, for the purposes of having cancelled and set aside as void certain conveyances of land and transfers of corporation stock and of procuring an accounting and other relief. The chancellor entered a comprehensive decree, setting forth his findings as to the various matters comprising the subject of the controversy, holding the equities to be with defendant, and sustaining her claim to the properties involved.
Plaintiff appeals to this court under four major points, wherein he protests as contrary to the legal and manifest effect and weight of the evidence the chancellor's conclusions (1) that no confidential relationship existed, (2) that the mother of plaintiff and defendant decided in 1929 to give all her properties to defendant, (3) that properties not transferred by the mother belong in equity to the defendant, and (4) that plaintiff is guilty of laches.
The controversy before us is intertwined with the facts and circumstances connected with the conveyances and transfers made to the defendant. It is necessary, in order to understand these, that at least the basic portion of the complex and lengthy narrative be given so as to clarify the essential phases of the dispute.
Plaintiff and defendant are the children of Mary V. Hallam, who died on May 6, 1939, at the age of seventy-two. All of the property involved in this litigation at one time belonged to Mary V. Hallam or to W.F. Hallam & Co., a Florida corporation engaged in real estate development. The corporation was wholly owned by Mary V. Hallam in her own right or came to her upon the death in 1920 of her husband, Willard F. Hallam, who died intestate. The children, upon their father's *200 death, relinquished to their mother their respective interests in their father's estate.
During the 1920s, before collapse of the Florida land boom, W.F. Hallam & Co. was a lucrative enterprise, possessed of extensive holdings, including lands in Florida, West Virginia, Nebraska, Texas, and Pennsylvania. Florida property of Mrs. Hallam and the corporation included several thousand acres of land, about 200 of which were in citrus groves, while the remainder were mostly raw lands. There was also the West Virginia home of the Hallam family called the Scottish Castle, a large mansion surrounded by spacious grounds, together with the Florida homestead of Mrs. Hallam, a structure known as the Clubhouse.
Upon her husband's death, Mary V. Hallam assumed control of the corporation and made the plaintiff son its secretary. In 1922, plaintiff was divested of that office because of his misconduct, and the mother replaced him with defendant. Plaintiff then departed the homestead and later engaged in a real estate and insurance business, spending some time also in military service. From the time of his father's death until approximately 1928, according to a list compiled by Mrs. Hallam in her own handwriting and by other evidence, the chancellor found that in excess of $75,000 was expended by Mrs. Hallam for the benefit of plaintiff and in payment for his mistakes and transgressions. Plaintiff was intemperate in his personal life and found himself upon a number of occasions in severe economic straits or in legal difficulties, from which he was redeemed by his mother.
Circumstances attendant upon the Florida land boom collapse resulted in numerous mortgages and items of indebtedness against the lands of Mary V. Hallam and W.F. Hallam & Co. Several suits were filed with resultant judgments, some of them stemming from activities of plaintiff. Defendant and her mother, living together at the Clubhouse, were reduced to chicken and dairy farming on a small scale and marketing of wood and fruit. A joint bank account opened and utilized by the two was continued by defendant after her mother's death. Defendant assisted her mother, both as to business and as to duties connected with the household. She wrote letters for her mother, drafted documents and communications for her in longhand, and performed manifold services with respect to her mother's affairs. She also contributed her own earnings toward the common household needs and, through her school-teaching salary, provided the chief source of their livelihood through many years, until the death of Mrs. Hallam. She ministered to her mother's needs in many ways. She gave to her mother a grove which had been a gift to her from her father, while a similar one given by the father to plaintiff was sold by him to his mother. Defendant always lived with her mother, except that Mrs. Hallam, for convenience, moved into the New Florida Hotel in Lakeland shortly before she died. Other than this, the two were separated only for brief periods of time.
In the latter part of 1928, Mrs. Hallam, upon advice of the family attorney, M.D. Wilson, created Scott Lake Properties, Inc., and Manning Hall Company, two corporations, each having 100 shares. She retained one share in one corporation for herself and issued the remaining shares in each to W.F. Hallam & Co., except that 15 shares were issued to Wilson or his associates in each corporation. She conveyed to those two corporations 2900 acres of land owned by W.F. Hallam & Co., unencumbered except for mortgages on some of the lands conveyed to Manning Hall Company.
In 1929, Mary V. Hallam deeded extensive acreage and improved property to defendant. She also deeded the Scottish Castle, subject to an outstanding mortgage; and in 1936, she deeded to defendant *201 the Clubhouse and surrounding acreage, also encumbered by mortgage indebtedness. A relatively small portion of the lands were not conveyed in 1929 but remained either in Mrs. Hallam's name or in that of W.F. Hallam & Co. In 1930, Mrs. Hallam transferred to defendant all of W.F. Hallam & Co.'s stock in the two subsidiary corporations, including her one share. Plaintiff knew of the conveyances and transfers made by his mother. After the conveyances, W.F. Hallam & Co. became practically inactive and was dissolved for nonpayment of taxes in 1936. In 1956, defendant had dissolved the two subsidiary corporations.
Monumental efforts were required of defendant to hold part of the properties, and considerable portions were lost for failure to pay taxes. In fact, delinquent tax lands were readily available everywhere; and from 1930 until 1943, defendant could not keep up the taxes. However, through purchase of tax deeds over the years, some of the lands were redeemed. Among the various obligations and encumbrances, there existed the extremely harsh Strickland mortgages. Through Wilson's efforts, these were foreclosed by him for benefit of the mortgagee without deficiency decrees. Wilson was entitled to claim as his fee a ten acre tract of land containing a nine acre citrus grove. He actually salvaged it for Mrs. Hallam. At her direction, this tract was conveyed by Strickland to defendant. Sale of fruit from the grove contributed to support of the family group living at the Clubhouse during the 1930s. A Colonel Goetz held a mortgage; but believing the lands to be worthless and being unwilling to pay further taxes on them, he assigned the mortgage to defendant in 1934 with the knowledge of Mrs. Hallam and of plaintiff. This mortgage encumbered some of the property remaining in Mary V. Hallam or W.F. Hallam & Co., but Mrs. Hallam wanted it assigned to defendant. The mortgage expired through time, and tax deeds on the property involved were obtained by defendant, this being deemed by Wilson to be simpler and cheaper than foreclosure.
Other encumbrances and obligations included the Lyons judgment for $23,000 emanating from a debt owed to the Lyons Fertilizer Company. This judgment had been assigned and some land was lost under it by levy in 1947. Plaintiff had attempted in 1945 personally to buy the judgment for $1,000. In 1951, defendant borrowed money, purchased it from the then owner, and, upon Wilson's advice, assigned it to him as trustee for defendant. In 1955, Wilson got a sheriff's deed and later conveyed the lands to the defendant.
In 1926 and 1927, Mrs. Hallam executed wills, essentially the same in content, with the 1926 will being modified in 1932 by a codicil, the effect of which was to change the 1926 will so as to bequeath additionally to defendant all of Mrs. Hallam's personal and household goods. In each of the wills, defendant was named executrix and trustee. By the terms of the 1926 will, Mrs. Hallam made a specific bequest of $10,000 to her attorney, Wilson. The bulk of Mrs. Hallam's estate was to be held by defendant in trust with provisions for its conversion into cash; and the will provided that upon conversion of the estate into cash or upon plaintiff's attaining the age of 40 years, whichever was later, the defendant was to pay herself $50,000 and the rest of the trust was to be shared by plaintiff and defendant alike. Neither will was ever probated, and both were kept by Wilson in his office through the years until, upon his death, the 1926 will and codicil were found there. Wilson during his last illness had turned over the 1927 will to defendant for use in this suit. Some evidence was introduced to show that Mrs. Hallam had executed another will in 1935, but this will was never found and its contents are unknown.
Shortly after Mrs. Hallam's death, a conference was held in Wilson's office with both plaintiff and defendant present. *202 Defendant testified, in effect, that her mother's will was then read, that her brother looked at it, that it was decided there was no need to probate the will because of the conveyances and transfers to the defendant, and that nothing of substantial value was left, particularly since the specific bequests to Wilson and herself far exceeded any possible value of her mother's estate. Plaintiff denied that the paper read by Wilson was a will but referred to it instead as his mother's "wishes and instructions," and he denied that there was an agreement to waive probate. The chancellor found that it was agreed at the conference that probate of the estate be waived in consideration of payment by defendant of the expenses of her mother's last illness and burial and that defendant had discharged her part of the agreement.
The State of West Virginia instituted condemnation proceedings against the Scottish Castle in 1951, and proceeds were paid to defendant in 1953, portions of the surrounding lands having been sold by defendant prior to that.
In 1953, defendant made her final settlement with Wilson, except that he did represent her with reference to the Lyons judgment. The $10,000 specific bequest to him had been paid by defendant as a "debt of honor" in several installments during 1947 from sales of property and fruit and from her salary and savings. Wilson had already delivered to her the 85 shares which she owned in each of the two corporations mentioned; and in the settlement, defendant acquired from Wilson the remaining 15 shares which he held in each corporation. She paid to Wilson the $25,000 left, after payment of debts, from the approximately $47,500 received from condemnation sale of the Scottish Castle. This was for legal advice, consideration for deeds, and for the shares of stock mentioned.
Plaintiff's points one and two, dealing with the relationship between Mrs. Hallam and her daughter and with Mrs. Hallam's intent in making the conveyances and transfers, will be considered together, since matters advanced under them by the parties are overlapping. Point one urges that there did exist between defendant and her mother a confidential relationship and not just that of parent and child, that defendant was a fiduciary and bore that relation to the plaintiff and Mrs. Hallam's estate, and that the relationship was created through the reposing by Mrs. Hallam of trust and confidence in defendant in business matters. Point two of plaintiff advances under a separate discussion the matter of intent of Mary V. Hallam with reference to all the properties here involved, controverting specifically the chancellor's conclusion that Mrs. Hallam decided in 1929 to give to defendant, aside from her homestead, all her properties and stocks in the subsidiary corporations. Advanced under point one are considerations of Mary V. Hallam's reasons for making the 1929 and 1930 conveyances and transfers, considerations which also are a part of point two dealing with intent. In the light of points one and two, we shall consider the conveyances and transfers made by Mrs. Hallam to defendant.
Concerning the relationship which existed between Mrs. Hallam and defendant, the chancellor found in essence (1) that defendant assisted her mother in countless ways, both before and after the conveyances and transfers, in functions pertaining to both business and the household, but that these services were not those of a fiduciary but were the helpful ministrations of a devoted and dutiful daughter, and (2) that the defendant was not the dominant member of the mother-daughter relationship but that even through her last illness Mary V. Hallam was a woman of strong and independent mind, not dominated by the influence of others, including her two children.
The plaintiff concedes that there was no undue influence or other wrongdoing in regard to the conveyances and transfers *203 between mother and daughter. He instead clearly relies upon an alleged wrongful withholding of trust property by defendant, stating that there was unjust enrichment arising from a confidential relationship. He claims that the conveyances and transfers were made to defendant so that indebtedness and judgments against Mrs. Hallam and W.F. Hallam & Co. could be compromised and adjusted and because of Mrs. Hallam's poor health, asserting that it was not the intention of Mrs. Hallam to divest herself of the beneficial interest in the lands and stock.
As to plaintiff's contention that the conveyances and transfers by his mother were made for the judgment reason and not with the intention of vesting absolute title in her daughter, defendant opposes this by stating that the conveyances and transfers were gifts, that her mother wanted her to have the property, and that one of the reasons was to make things equal between plaintiff and herself, since so much of her mother's estate had been dissipated because of plaintiff. With respect to plaintiff's contention that the conveyances and transfers were made for the judgment reason, this appears to have been directed toward the primary obligation constituted within the Strickland mortgages. Suits to foreclose these were not instituted until May of 1930, and prior to that, under an agreement negotiated by Wilson, and later substantiated by plaintiff's own testimony, it was understood that these would be foreclosed but that there would be no deficiency decree.
There are evidentiary conflicts as to Mary V. Hallam's reasons in making the conveyances and transfers. However, there is testimony by several persons that Mrs. Hallam stated her intention to give all her property to her daughter. There is no direct testimony that she ever stated to anyone that, in making the conveyances and transfers, she did not intend to vest title to the properties in her daughter. In any event, all the conveyances and transfers were absolute in form, contained no hint of a trust relationship, and there is no evidence that Mary V. Hallam ever sought re-conveyance or re-transfer of the properties, although ten years elapsed before her death.
Even if the mother was attempting to preserve the properties, plaintiff does not contend that in so doing she was committing any fraud. On the contrary, he states that there was no wrongdoing in connection with the conveyances and transfers by the mother to the daughter. As to this, the law favors a presumption that a gift from a parent to a child is voluntary and that such a relationship is not of so confidential a status as to create the presumption of fraud. See Rappaport v. Kalstein, 1946, 156 Fla. 722, 24 So.2d 301. Neither does plaintiff contend that there was an oral agreement. If defendant had orally promised to hold the properties in trust for her mother at the time she received them, such promise was an attempt to create an oral express trust and was unenforceable. See Mills v. Mills, Fla.App. 1959, 112 So.2d 298; Wodonos v. Wodonos, Fla., 1952, 62 So.2d 78; Crockett v. Crockett, 1940, 145 Fla. 311, 199 So. 337; and section 689.05, Florida Statutes, F.S.A. The judgment reason would not necessarily mean that Mrs. Hallam wanted to save the properties for herself; a desire by Mrs. Hallam to salvage some part of what had once been a large estate would not be inconsistent with a desire to effect the saving for her daughter. This is particularly true in view of her daughter's devoted ministrations through the years and in view of the fact that plaintiff had benefited so greatly from his mother in the past. It must also be remembered that the properties given defendant were at the time worth but a small fraction of their present-day value.
If Mary V. Hallam voluntarily made the conveyances and transfers to her daughter as outright gifts, then there was no unjust enrichment of which the plaintiff *204 may complain as to these. Generally, a person may dispose of his property as he chooses.
We therefore consider plaintiff's position in the light of certain aspects of the law of trusts. This law is broadly divided into two categories, that dealing with the "express trust" and that dealing with implied trusts, the latter including two kinds classified respectively as the "resulting trust" and the "constructive trust." It is a constructive trust which plaintiff is seeking to have impressed, and there is no contention that either an express trust or a resulting trust arose.
A constructive trust is a remedy which equity affords in order to effectuate justice. It arises through operation of law. Where one through fraud, abuse of confidence, or other questionable means gains property which in equity or good conscience he should not be permitted to retain, equity will raise a constructive trust. Tillman v. Pitt Cole Co., Fla., 1951, 53 So.2d 772. Such a trust may be a remedy, under appropriate circumstances, against unjust enrichment. However, in order that a constructive trust be established, it is necessary that the evidence be so clear, strong, and unequivocal that it removes from the mind every reasonable doubt as to the existence of the trust. See 33 Fla.Jur., Trusts, section 124, p. 124; Smith v. Smith, Fla., 1959, 108 So.2d 761; Quinn v. Phipps, 1927, 93 Fla. 805, 113 So. 419, 54 A.L.R. 1173.
Under his claim that a constructive trust has arisen, plaintiff emphasizes that there was no undue influence or other wrongdoing in connection with the conveyances and transfers. He insists, however, that upon the basis that defendant breached the confidential relationship which he states existed throughout, a constructive trust both as to the intervivos conveyances and transfers and the after-acquired properties arose only several months prior to institution of this suit when defendant refused to divide Mrs. Hallam's estate. He asserts that then, for the first time, the necessary antagonistic relationship developed to support the creation and declaration of a constructive trust.
The plaintiff cites and relies upon the case of Williams v. Grogan, Fla., 1958, 100 So.2d 407, 409, to support the proposition that, when a person stands in a position of trust and confidence, a wrongful withholding of property after a conveyance has been voluntarily made is sufficient to raise a constructive trust on the ground of unjust enrichment, although there may have been originally no abuse of confidence. However, in that case, there actually was shown to have been an abuse of confidence. There, a son deeded his interest in his father's estate to his mother. The transaction was induced when the mother's attorney, at a conference with the mother present, admonished the son that he was "living too high," that he was jeopardizing his property, and suggested to the son that he deed the property to the mother, assuring him that the mother would not waste it and would take care of his interest. At the time, the mother had already executed a will but made no disclosure of this to her son; and after the son had been induced to deed his property to her in order to preserve it for him, she permitted portions of it to pass by her will to other persons. The court held that a constructive trust arose, pointing out that where a person "acquires title to property through the influence of a confidential relationship" a court of equity will prevent the "abuse of the confidence." The situation there was one wherein the mother and ultimately her estate were held to have been unjustly enriched. It is clear that there was a wrongful abuse of confidence from the beginning and that through it the son was induced to part with his property. In the Williams v. Grogan case, there was no uninduced and uninfluenced conveyance or transfer arising from the grantor's own initiative as in the present case; on the *205 contrary, the mother, speaking through her attorney, who himself testified at the trial, promised the son that she would take care of the property being deeded to her for that purpose. It was her breach of that promise in the light of the fiduciary relationship which arose, together with the clearly established purpose of the conveyance and the fact that it was induced, which constituted abuse of confidence arising from a confidential relationship. The confidential relationship was not founded merely upon the son-mother kinship and the closeness which existed by virtue of it. It cannot here be said that there is a comparison in the relationship which arose between the son and his mother in the Grogan case and that which existed between the mother and daughter in the present case. The Grogan case is not that broad.
Coupled with the judgment reason, plaintiff states as another reason and intent involved in the making of the conveyances and transfers by Mary V. Hallam that of his mother's poor health, which he asserts did not permit her to cope with the pressing financial problems. He continues that the evidence establishes her lack of good health and that defendant and the attorney Wilson were the logical persons in whom Mrs. Hallam should place the responsibility of settling with creditors. The record does show that Mary V. Hallam was obese and that she suffered from arthritis, rheumatism, and high blood pressure. While there is evidence that she at times complained of these, there is no evidence that they caused her decision to make the conveyances and transfers to defendant. Neither is it established that she, at the time of the conveyances and transfers, no longer felt physically, mentally, or emotionally able to retain or exercise dominion and control over the properties.
Plaintiff infers from the wills of Mary V. Hallam and the 1932 codicil that Mrs. Hallam thought she had a large estate and that the intent of Mrs. Hallam as asserted by the plaintiff is thus shown. However, there is abundant evidence that Mrs. Hallam wanted her daughter to have what she had left. It cannot be concluded that the wills and codicil show an intent or purpose on the part of Mary V. Hallam to retain the beneficial interest in the properties conveyed and transferred to defendant. Neither does the correspondence mentioned by plaintiff serve to accomplish that effect.
Plaintiff has averred that the $50,000 specific bequest to defendant in the wills and codicil of Mary V. Hallam constituted the sum total of her equalization measure as to her two children. The chancellor found that Mary V. Hallam decided in 1929 to convey her last remaining properties except her homestead to defendant to equalize as nearly as possible the vast amounts paid and lost to and for the benefit of plaintiff and that the transfers to her daughter in 1929 and 1930 and thereafter seemed insignificant in consideration of their then value compared to resources already given plaintiff. Sums expended because of plaintiff as compiled by Mrs. Hallam and as shown by other evidence reveals an amount in excess of $75,000, not counting certain I.O.U.s and other items, of which, in the mother's own written words, "* * * there are many more." As against this sum, there is the consideration that the lands given defendant were worth only a fraction of their later value, the unimproved lands being comparatively worthless at the time. Additionally, defendant had given her mother a $10,000 citrus grove, her only asset, while plaintiff sold to Mrs. Hallam a similar grove. Also, in 1930, defendant began teaching school, and it was chiefly through her teaching salary that she supported her mother the rest of her days.
Plaintiff's contention that his mother's wills were concealed and suppressed stand in direct conflict with the assertion of the defendant that the will of Mary V. Hallam *206 was read by Wilson and looked at by all concerned at the conference in Wilson's office following Mrs. Hallam's death. Nor does the argument advanced by plaintiff as to the testamentary documents being kept through the years by the attorney Wilson in his office establish their concealment and suppression by defendant.
We conclude that plaintiff has failed to establish either that the properties conveyed and transferred by Mrs. Hallam to defendant had been placed in trust with defendant for Mary V. Hallam, or that a constructive trust as to them arose between plaintiff and defendant. We are instead in accord with the chancellor's conclusion that through her deeds of conveyance of lands and transfers of stock Mary V. Hallam made bona fide voluntary gifts to defendant.
There were other intervivos acquisitions by defendant. These passed to her through instruments of conveyance with Mrs. Hallam's knowledge and approval. We therefore sustain also the chancellor's conclusion upholding defendant's right in the property deeded to defendant by Strickland at her mother's request when those mortgages were foreclosed and, as to the Goetz mortgage, her right to the portions of the lands encumbered by it which were acquired by tax deeds during her mother's lifetime instead of by foreclosure of the Goetz mortgage assigned to defendant. No constructive trust later arose for plaintiff as to these properties.
In the first portion of this opinion we have dealt with plaintiff's points one and two and with the circumstances existing during the lifetime of Mary V. Hallam which, under plaintiff's position, were circumstances associated with an alleged later abuse of confidence by defendant. We have held that in consideration of those circumstances, no constructive trust can later have arisen as to the conveyances and transfers to defendant prior to her mother's death. The properties acquired by defendant after her mother's death, protested under plaintiff's point three, together with the question of laches of the plaintiff in instituting his action as set out under point four, will be comprehended in the latter portion of this opinion.
We shall also consider the doctrine of equitable estoppel as it may apply to plaintiff's claim or claims. Although defendant in her answer specifically designated by name neither laches nor equitable estoppel, she through her allegations in legal effect raised both defenses. Laches was comprehended by the chancellor as a defense and was one of the reasons employed by the court in the rendition of the final decree favorable to the defendant. Even though it appears that equitable estoppel was not mentioned by the chancellor or directly argued here as such, we think that, under the allegations of the answer and the circumstances of the case, it should be considered.
Acquisitions of property here involved which were made by defendant after the death of her mother, attacked by plaintiff under his point three, include some lands encumbered under the Goetz mortgage, which had been assigned to defendant with her mother's approval. Tax deeds on some of those lands were purchased by defendant before her mother's death, but on others, tax deeds were bought afterwards. Defendant, prior to her mother's death, could have acquired all the lands encumbered by the Goetz mortgage through the avenue of foreclosure. However, Wilson had advised her that purchase of tax deeds would be simpler and cheaper. Mary V. Hallam knew of the lands acquired by tax deeds prior to her death and was in accord with the acquisitions; and plaintiff knew that defendant was purchasing tax deeds on those properties, both before and after the mother's death. He handled the sales of some of these for the defendant, claiming and receiving realtor's commissions.
*207 In addition to the lands thus acquired, there were some lands which were omitted from the 1929 transfers into the two subsidiary corporations. As to some of those lands not transferred, including the Babcock and Valencia groves, Wilson with Mrs. Hallam's full knowledge obtained tax deeds in 1934 in his mother's name. Since 1934, defendant has paid taxes on the lands, cared for the groves, and sold the fruit. Her mother, before her death, knew this was being done. Plaintiff knew this also. In the 1953 settlement, Wilson transferred these lands to defendant.
Additional lands remaining in the name of Mrs. Hallam or W.F. Hallam & Co. were encumbered under the Lyons judgment and some of these were lost pursuant to the judgment lien after Mrs. Hallam's death. As to others of those lands, defendant after her mother's death procured tax deeds or through Wilson's efforts got a sheriff's deed under the judgment which she had previously purchased.
Having delineated the after-acquired properties, we pause now to consider the doctrine of laches as it may apply to specific properties here involved, whether real estate or shares of stock. Mary V. Hallam died in 1939. The suit was begun on March 5, 1956.
Insofar as conveyances of real estate by Mary V. Hallam to defendant are concerned, these were of record more than 20 years prior to institution of the suit. Section 95.23, Florida Statutes, F.S.A., provides that after the lapse of twenty years from the record of any deed purporting to convey lands, no person shall assert any claim to those lands as against the claimants under the deed or their successors in title. We therefore uphold the chancellor's determination that laches bars the claim by plaintiff as to these lands. See Wadlington v. Edwards, Fla. 1957, 92 So.2d 629; Grable v. Nunez, Fla. 1953, 64 So.2d 154. We also agree with the chancellor's finding that laches precludes any claim by plaintiff to the lands acquired by deed from Strickland when the Strickland mortgages were foreclosed and to the lands acquired by defendant before the death of her mother through tax deeds on properties encumbered by the Goetz mortgage. Concerning the shares of stock in the two subsidiary corporations transferred in 1930 by Mary V. Hallam to her daughter, a period of about 26 years having elapsed before suit, we conclude that the doctrine of laches is also applicable against plaintiff's claim. See Voliva v. Bennett, 5 Cir., 1953, 201 F.2d 434.
We have previously sustained the chancellor's decision that the real and personal properties conveyed and transferred by Mrs. Hallam to defendant were voluntary gifts and that other properties acquired by defendant during the lifetime of her mother were conveyed to her through instruments of conveyance with full knowledge by Mrs. Hallam and with her approval and that there is no trust nor right of plaintiff as to these.
The positions of the parties must also be evaluated in the light of the doctrine of equitable estoppel. In this regard, the factual situation which we shall delineate also furnishes support to the application of the doctrine of laches as it concerns the properties acquired by defendant during the mother's lifetime and hereinbefore specifically dealt with under that doctrine. Plaintiff admits that he was aware of the transactions and activities in which defendant engaged, but he insists that his inaction during the more than 16 years following his mother's death was due to instructions from Wilson informing him that defendant would hold the properties in order that things could be worked out in her name. He states that defendant also indicated this to him. His position is that defendant over that time was acting under a fiduciary relationship to him.
With this in mind, we must analyze the facts and circumstances connected with plaintiff's conduct throughout the years and thus connected with defendant's exercise of *208 total dominion over and possession of the properties. During those years, plaintiff acted toward the properties as one with no interest would act, stating to different persons that his mother had left him only a dollar. Prior to his mother's death, he offered no assistance when defendant was supporting and giving personal care to her mother and attempting to preserve the properties. Nor did he lend a helping hand to defendant during the years following the death of Mrs. Hallam, although great efforts and substantial expenditures of personal funds were necessary. Plaintiff's own personal secretary from 1946 to 1954 testified that she had never heard him make any reference to an interest in any of the properties involved, but that upon inquiry plaintiff would refer those inquiring to defendant.
Neither did plaintiff demand a share in proceeds of the numerous sales of portions of the lands of which he was aware. Rather, upon some of the sales, he claimed and was paid realtor's commissions. Nor did he request conveyance to himself of any of the properties which he knew had been vested in his sister. Additionally, plaintiff handled insurance for defendant in her name as owner of the Clubhouse and the Scottish Castle. He himself purchased from defendant some land on Scott Lake for the purported intention of building his home upon it, although he shortly thereafter sold it for a profit which he retained. He handled sales of lands both for defendant and for the two subsidiary corporations, being paid realtor's commissions.
Defendant, meanwhile, with plaintiff's full cognizance and with his acquiescence, exercised unfettered dominion and possession over the properties here in controversy, extending her financial resources, caring for the lands, and from 1943 paying taxes on all of them.
It was for a period of 16 years after his mother's death that plaintiff states he proceeded under the belief that his sister, although outwardly exercising total dominion and possession over the properties involved, was really acting under a fiduciary relationship to him. Assertion of his claim came over 12 years after defendant personally began paying taxes on the lands and more than 20 years following all conveyances and transfers made by Mary V. Hallam, or following the last of those conveyances, the Clubhouse. Plaintiff had knowledge of the vesting of title in defendant through the instruments by which they were conveyed or transferred. By his own admission, plaintiff never did put any of his own money into any of the properties. On the other hand, services performed by him as to the properties were paid for by defendant; and they were performed by plaintiff for defendant as between any third party and the owner of the properties concerned. He came forward to claim a share of the properties only after there had been a great enhancement in the value of the lands.
Plaintiff protests the chancellor's failure in his decree to make specific mention of the lands acquired by defendant under the Lyons judgment and of the 15 shares of stock in each of the two subsidiary corporations held by Wilson in his name and transferred to defendant. The defendant's right to those properties was implicitly sustained, however, by the decree favorable to her.
The Lyons judgment had existed for many years, even prior to the death of Mrs. Hallam. Plaintiff knew this and had himself attempted to buy it in 1945. Some lands were lost under it in 1947; and in 1951, defendant herself purchased it. Subsequently, Wilson arranged for her acquisition of the lands remaining under it through sheriff's sale. There was the same independence of action by the two as had existed throughout with reference to defendant's acts of dominion over the properties and plaintiff's actions as if by a third party and not as if by a joint owner. As to the 15 shares of stock in each of the two *209 subsidiary corporations, these shares of stock were issued to Wilson or his associates by Mary V. Hallam at the time the corporations were formed. Testimony of plaintiff and defendant concerns what their mother thought or said. Plaintiff testified that his mother told him that the stock was held by Wilson as security. Defendant testified that her mother thought she owned the shares of stock. However, the transfer to Wilson or his associates on the face of the stock certificates was an outright transfer, and the transfer by Wilson to defendant was also an outright transfer. There is shown no restrictive ownership. With respect to her acts as regards the dissolved corporation, W.F. Hallam & Co., defendant never made any attempt at secrecy, and plaintiff was fully aware of these acts over the years.
Concerning the relationship between plaintiff and defendant, it cannot be said that a fiduciary status is raised merely from a brother-sister kinship. See Doswell v. Hughen, 1957, 266 Ala. 87, 94 So.2d 377; Clark v. Clark, 1947, 398 Ill. 592, 76 N.E.2d 446; and Scherman v. Scherman, 1947, 395 Ill. 574, 71 N.E.2d 16.
Florida case law upon the subject of equitable estoppel is abundant, and the issue has been raised in an infinite number of varied factual situations. It has been repeatedly held that the facts of each individual case must govern. See Trustees of Internal Imp. Fund v. Claughton, Fla. 1956, 86 So.2d 775; Terrell v. Weymouth, 1893, 32 Fla. 255, 13 So. 429.
There exists a close relationship between the doctrines of laches and estoppel, laches being sometimes referred to as a species of estoppel and being frequently an element of it, even though the terms are not synonymous. 12 Fla.Jur., Estoppel and Waiver, section 26, p. 403.
The essential ingredients of equitable estoppel are generally considered under Florida cases to be "(1) Words and admissions, or conduct, acts, and acquiescence, or all combined, causing another person to believe in the existence of a certain state of things. (2) In which the person so speaking, admitting, acting, and acquiescing did so willfully, culpably, or negligently. (3) By which such other person is or may be induced to act so as to change his own previous position injuriously." See Coogler v. Rogers, 1889, 25 Fla. 853, 7 So. 391, 394; Steen v. Scott, 1940, 144 Fla. 702, 198 So. 489; and 12 Fla.Jur., Estoppel and Waiver, section 24, pp. 400-401.
Insofar as it concerns the trial of title to land, equitable estoppel is a doctrine by which a person is precluded from setting up his legal title because he has through his acts, words, or silence led another to take a position in which the assertion of the legal title would be contrary to equity and good conscience. Terrell v. Weymouth, 1893, 32 Fla. 255, 13 So. 429; Doyle v. Tutan, Fla.App. 1959, 110 So.2d 42.
The principle upon which an estoppel by silence or inaction is grounded derives from the rule of equity that if one is silent when he ought to speak he will be foreclosed from speaking when conscience requires him to be silent. Hendricks v. Stark, 1930, 99 Fla. 277, 126 So. 293; 12 Fla.Jur., Estoppel and Waiver, section 42, p. 418.
Plaintiff, after the lapse of many years dating back to a time when properties in issue were worth but little, now speaks to assert a claim in what, because of defendant's efforts, expenditures, and sacrifices over those years, has greatly increased in value.
With timely action by plaintiff, the attorney Wilson could have cast light upon many issues brought into controversy in this dispute, including the wills of Mary V. Hallam, their alleged suppression, what transpired at the conference in his office after Mrs. Hallam's death, the 15 shares of stock in each of the two subsidiary corporations, and other matters contended by plaintiff. Instead, these matters were not asserted until Wilson was in his terminal illness.
*210 In large part the evidence was composed of testimony by parties to the suit; it was necessary that the chancellor evaluate that testimony, along with the other evidence. In so doing, the chancellor, as trier of the facts, had the right to accept the version of the defendant and reject that of the plaintiff. In view of the considerations here discussed, the shield of equitable estoppel is now raised against plaintiff's assertion of any legal claim to the properties here involved.
Moreover, the burden of proof was on plaintiff to establish his case. He failed to fulfill the quantum of proof required for establishment of a claim to the properties in controversy, either through the avenue of a constructive trust or otherwise.
In our consideration of the case, we feel that it is not amiss to make the comment that the record is a gigantic one, comprising over 1300 pages of testimony, many pages of pleadings, and several hundred exhibits.
The decree of the chancellor is affirmed.
Affirmed.
SHANNON, C.J., and REVELS, P.B., Associate Judge, concur.