In re SOMBRERO REEF CLUB, INC., d/b/a Latitude 24° Club Resort and d/b/a Latitude 24° Vacation Club, a Florida Corporation, Debtor.

SOMBRERO REEF CLUB, INC., d/b/a Latitude 24° Club Resort and d/b/a Latitude 24° Vacation Club, a Florida Corporation, Plaintiff,

v.

Ferdinand J. STACKEL, Defendant.

Bankruptcy No. 80–01266–BKC–JAG. Adv. No. 81–0363–BKC–JAG–A.

United States Bankruptcy Court, S. D. Florida.

Nov. 5, 1981.

Stephen H. Judson, Blackwell, Walker, Gray, Powers, Flick & Hoehl, Miami, Fla., for defendant.

Law Offices of Samuel L. Heller, Fort Lauderdale, Fla., for plaintiff.

## FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

This is an adversary proceeding brought by Sombrero Reef Club, Inc., a debtor-in-possession in this court, as seller, seeking to obtain as liquidated damages the deposit made by defendant purchaser on a contract. The defendant counterclaimed for the return of his deposit. This court concludes that the plaintiff must prevail.

## FACTS

In the course of the chapter 11 administration, the plaintiff as debtor-in-possession sought court approval of a contract through which it proposed to sell its assets, a resort marina complex in the Florida Keys and the tangible and intangible assets pertaining thereto, to the defendant, Ferdinand J. Stackel. A hearing in connection with that

proposed contract was held before the court in the chapter 11 case (Case No. 80–01266–BKC–JAG) on April 16, 1981 at which time much evidence was taken concerning the benefit of the contract to the estate and the ability of Stackel as purchaser under the contract to comply with the terms and conditions thereof. The hearing on April 16, 1981 resulted in the entry of an order authorizing sale of debtor's property (Plaintiff's Exhibit No. 4) on April 21, 1981 in the main proceeding. The deposit receipt and contract for sale and purchase between the plaintiff and the defendant Stackel dated April 16, 1981 and the modification agreement dated April 17, 1981 referred to in the order are in evidence in this case as Plaintiff's Exhibits Nos. 1 and 2 respectively. J. Michael Fitzgerald, the escrow agent under the purchase and sale agreement, was one of the original defendants in this adversary case, but he was dismissed by stipulation of all parties upon his delivering the funds and stock certificates he held in escrow to the attorney for the debtor-in-possession as substitute escrow agent, who agreed to be bound by the ultimate decision in this case.

A second modification agreement was executed by all of the necessary parties between May 26, 1981 and May 29, 1981 with counterpart copies of said second modification with all necessary signatures being in evidence as Plaintiff's Exhibits Nos. 8 and 8a. Court approval of this second modification agreement was neither sought nor obtained. In the second modification agreement, Stackel represented that one of the conditions precedent to closing, the obtaining of a new first mortgage by Stackel as purchaser, had been fulfilled. Among other provisions, the second modification also changed the form of the deposit to be made by the purchaser from $100,000 in cash to only $65,000 in cash, plus 25,000 shares of Turning Basin, Inc., the stock of which was traded over the counter and was quoted at a price which would have made those shares worth $56,000 if it could have been sold at the quoted price on the date that the modification agreement was made. Also, the second modification extended the time for closing from May 25, 1981 to "not later than June 2, 1981 as to which date time will be of the essence."

Notwithstanding the above quoted language, the attorneys for the plaintiff extended the closing date on two occasions, first to June 5, 1981 and then to June 22, 1981 (Plaintiff's Exhibits Nos. 12 and 14) by reason of delay on the part of the defendant.

The attorneys for the seller inquired of Stackel, to whom Stackel wished the abstracts sent for examination. Stackel delayed answering but ultimately determined that Fitzgerald would examine the title for the buyer. The abstracts through a date in early March, 1981, were sent to Fitzgerald and an update subsequent to the early March continuation was also furnished. Jeffrey Beck, one of the attorneys for the plaintiff, testified that he had examined the abstracts and found no title defects other than some of the judgments of record which would be satisfied in connection with the closing. Neither Fitzgerald nor anyone else on behalf of the purchaser had ever made any objection to the title.

Another provision of the contract (Plaintiff's Exhibits Nos. 1 and 2) required that the seller secure prior to closing an adjudication by this court as to the validity or invalidity of each and every time-share agreement between the plaintiff and various purchasers of time-share membership agreements involving the property being sold under the contract, which the plaintiff, in the bankruptcy proceeding, contended were in default. The buyer agreed to assume all of the seller's obligations with respect to the time-share purchasers. The record shows that the complaint for declaratory judgment to ascertain the validity or invalidity of the time-share agreements was filed on June 16, 1981 and Final Judgment was entered on July 29, 1981. Stackel had testified on April 16, 1981 that it made no difference to him as purchaser whether any or all of those that were asserted to be in default were held to be either valid or invalid. At his deposition and trial in this adversary proceeding, he did not recede from that position but contended that he

needed to know which were in existence prior to his closing. Stackel's expert witness, an attorney, admitted that this failure alone by Sombrero probably would not have been a material breach justifying a lawsuit by Stackel. At no time did Stackel ever advise the plaintiff that the failure to have completed the adversary proceeding concerning the time-share agreements was in any way holding up the closing.

No party to the contract ever prepared closing documents. The attorneys for the seller contended that they could have been drawn in a few minutes at the closing itself since all of the information was at hand and collated on work sheets.

In addition to the written representation in the modification agreement, Stackel told the president of Sombrero and its attorneys, in separate telephone conversations, that he had his financing. Stackel never divulged the identity of his lender nor did anyone purporting to represent a lender contact the plaintiff to get any information whatsoever for closing a loan in conjunction with the purchase and sale. The attorney for seller stated that no further inquiries were made by the seller because Stackel had sought additional time to obtain more favorable financing, and it was assumed that the first commitment might be moot. Stackel did not inform Sombrero that he did *not* have financing until after Sombrero's adversary complaint had been filed.

Plaintiff's attorneys state that they were ready, willing and able to close on June 22, 1981 at 2:00 p.m. pursuant to the letter Jeffrey Beck had sent to the defendant, Stackel (Plaintiff's Exhibit No. 14), but that no one on behalf of the purchaser either appeared or informed them that there would be no closing. (As previously noted, the seller had not yet on June 22 fulfilled the contract provision of having an adjudication as to the validity or invalidity of the time-share agreements.)

By letter dated June 23, 1981, plaintiff's attorneys demanded possession of the cash and stock held in escrow by Fitzgerald (Plaintiff's Exhibit No. 16). Stackel made no further effort to establish a closing and

never asserted his readiness, willingness and ability to actually close thereafter. This adversary proceeding was filed on July 29, 1981. Stackel made a counter-demand of Sombrero for return of the deposit to him by letter dated August 19, 1981 (Plaintiff's Exhibit No. 18). The various legal issues raised by the pleadings and memoranda will be discussed below.

All agree that Stackel never in fact had his mortgage commitment. In his depositions, Stackel was vague and seemed confused as to whether or not he in fact had a mortgage commitment. There definitely was no written commitment. The court concludes that a person of Stackel's maturity, education and experience knew at all times pertinent that he did not in fact have a mortgage commitment. He knew this when he executed the second modification agreement in late May, 1981 and he knew it throughout the time that he was obtaining delays in closing the transaction. The mortgage which he thought he could negotiate had numerous complexities which would have required much negotiation of all terms and conditions before any mortgage loan could have resulted.

The evidence also reveals that contrary to the impression that Stackel created at the April 16, 1981 hearing in the main proceeding on approval of his contract of purchase, he in fact did not have any money of his own at risk in the transaction. He testified that when he was young he did make investments but that as he gained maturity and experience, he obtained his equities through his entrepreneurship and promotion.

The court further finds that Stackel represented that he had his mortgage in order to gain additional time within which to try to *obtain* a mortgage in the first instance, not just to get a better one as he had stated to the representatives of Sombrero.

During the delay occasioned by this misrepresentation on the part of Stackel, Sombrero abandoned its efforts to firm up the contract which stood in second priority in the court's order of April 21, 1981 (the Carr contract) (Plaintiff's Exhibit No. 4) or to

seek other potential buyers. During the period of time from April 16, 1981 through June 22, 1981 and to the present time, the plaintiff as debtor-in-possession, continued to incur expenses and accrue interest and other obligations in connection with the ownership and operation of its primary asset, the motel-marina that is involved in this case. The evidence is that the other potential contracts which existed on April 16, 1981 and which have been discussed since have come to naught. The purchaser under the Carr contract never completed the furnishing of the required earnest money deposit and none of the other potential contracts are presently viable.

## LAW

The court has been assisted in its determination of the issues by excellent memoranda supplied by counsel and prepared under the time pressures dictated by the nature of this case.

Because of Stackel's failure to close, which plaintiff asserts is a breach, plaintiff seeks to obtain as liquidated damages under paragraph U of the Deposit Receipt and Contract for Sale and Purchase, (Plaintiff's Exhibit No. 1) the deposit supplied by the purchaser. There is presently no dispute that Stackel did not have financing on any of the intended closing dates, he does not now have financing, and there is no expectation that he could obtain financing in the foreseeable future. Nevertheless, the court concludes that Stackel is equitably estopped from asserting his inability to obtain financing and the failure of this condition precedent, as a defense to plaintiff's suit.

■ After careful consideration of plaintiff's arguments, the court concludes that Stackel did *not* impliedly waive the financing provision by making a written representation in the second modification agreement that he had obtained the necessary financing, or by his conduct generally. None of the cases cited by plaintiff is authority for such a conclusion on these facts. Logically, the affirmative representation that a condition precedent has been met is the opposite of a waiver of such condition, and Stackel's

continued attempts to obtain financing also reaffirm the importance and necessity for the provision. Stackel's procuring extensions of time, and his failure to assert the excuse that he did not have financing are consistent with his continued attempts to close. It does not make sense to penalize a party (by implying waiver) for conduct which was in furtherance of completion of the contract. It would clearly have been in plaintiff's interest if defendant had been able to obtain the financing during the extension of time, rather than having asserted his defense of failure to obtain it at the time first set for closing. In fact, the benefit to plaintiff of a potential resuscitation of the transaction was consideration for granting defendant more time. See *Ehringer v. Gross*, 182 So.2d 460 (Fla.App. 1966).

■ Turning to the issue of estoppel, whether an estoppel exists depends on the circumstances of each case. *Finesmith v. Singer*, 216 So.2d 39 (Fla.App.1968); *Trustees of Internal Improvement Fund v. Claughton*, 86 So.2d 775 (Fla.1956). The effect of an equitable estoppel is to prevent a party from asserting his rights under a general technical rule of law, when he has so conducted himself that it would be contrary to equity and good conscience for him to allege and prove the truth. *Horn v. Cole*, 51 N.H. 287, as quoted in *Claughton*.

■ Although the definitions and elements of estoppel have been stated in many ways, in the application to this case they can be summarized as follows: To be estopped, a party must have, through words or conduct, knowingly misrepresented a material fact, with the intention or expectation that it be acted upon by the other party, and the party claiming estoppel must have had no knowledge of the truth of the facts in question and must have suffered detriment in reliance on the misrepresentation or *will* suffer detriment if the other party is not estopped. 22 Fla.Jur.2d, Estoppel And Waiver, generally, and at § 31 "Essential Elements", and cases cited therein; *Quality Shell Homes & Supply Co. v.*

*Roley,* 186 So.2d 837 (Fla.App.1966); *Hallam v. Gladman,* 132 So.2d 198 (Fla.App. 1961); *Davis v. Evans,* 132 So.2d 476 (Fla. App.1961), cert. den. 136 So.2d 348. It has been held that benefit to the party to be estopped is a substitute for reliance and injury by the party claiming estoppel, *L. B. Price Mercantile Co. v. Gay,* 44 So.2d 87 (Fla.1950).

■ Stackel made both oral and written statements that he had received the financing contemplated by the condition in the purchase and sale contract. The court has found that Stackel knew of the untruth of these affirmative statements, and that he deliberately made the statements with the intention of misleading the debtor to the extent that he sought additional time to try to get financing, and to prevent Sombrero from reviving the competing contracts.

The issues relating to the position of Sombrero are more difficult. Defendant asserts that Sombrero had no right to rely on the false statements because it should have known from the unusual circumstances that the statements were not true, and it could easily have verified the truth or untruth by asking for the name of Stackel's lender and contacting that lender. The court concludes that plaintiff was not required to take these steps. The facts here were not in the domain of public knowledge as is a state statute (*Overstreet v. Bishop,* 343 So.2d 958 (Fla.App.1977),) or the status of recorded title to land (*Price v. Stratton,* 45 Fla. 535, 33 So. 644 (1903).) Here the parties obviously did not have the same knowledge, and neither did they have the same means of ascertaining the truth. The fact in question involved the status of a relationship between Stackel and another, unknown party, and Sombrero's only means of ascertaining the truth was through inquiry to Stackel, the person originating the misrepresentation. Given the nature of the representations and the transaction, it does not strain common sense to reach this result. While attorneys for sellers customarily investigate a purchaser's mortgage commitment well before closing, it was logical here that they delayed, believing Stackel might obtain his "better" commitment, and that investigation of the first lender would have been a waste of time.

Through his misrepresentations, Stackel did cause detriment to Sombrero. Stackel did not inform plaintiff that he did not, in fact, have financing at any time prior to the bringing of this adversary action. Sombrero clearly changed its position in deciding to bring the lawsuit, where it might instead have abandoned the Stackel contract and actively pursued other contracts during this period, had it known that the condition precedent had not, in fact, been satisfied. It suffered loss in the deterioration of the other contracts and in its failure to immediately seek new ones, from the time of Stackel's first misrepresentations. It has suffered the continuing expenses of operation and interest in this interim. Even relatively small expenses and small periods of time can be crucial to a debtor-in-possession in these circumstances, and to its creditors. Furthermore, the misrepresentations did benefit Stackel by excluding other potential purchasers from the seller's consideration, and gaining more time for himself.

Where, as here, a party with no risk and only the possibility of substantial rewards to himself, affirmatively misleads a debtor-in-possession regarding a contract approved by the court and affecting hundreds of persons, in the interest of achieving his own benefits, it verges on trifling with the bankruptcy administration. Under these circumstances, defendant is properly estopped from asserting a failure of the condition precedent to the contract.

Defendant has asserted a number of other affirmative defenses, any one of which, if valid, would preclude recovery by plaintiff. The court has carefully considered each, and has ultimately concluded that plaintiff must prevail.

Defendant argues that paragraph U of the contract is not a valid liquidated damages provision, but an unenforceable penalty provision or, alternatively, that under the circumstances, it would be unconscionable to effect this forfeiture.

In *Hutchison v. Tompkins*, 259 So.2d 129 (Fla.1972) the Florida Supreme Court held that a liquidated damages provision will not be invalid, as a penalty, where damages are not readily ascertainable at the time the contract is entered into, regardless of whether or not they are ascertainable at the time of breach. The court went on to state: "The land sale market in Florida fluctuates from year to year and season to season, and it is generally impossible to say at the time the contract for sale is drawn what vendor's loss (if any) will be should the contract be breached by purchaser's failure to close." 259 So.2d 132.

However, in dicta, the *Hutchison* court further stated that, even though a liquidated damages clause is valid, a court of equity may relieve against a forfeiture if the forfeiture would be unconscionable in light of circumstances existing at the time of breach. The hypothetical example given in *Hutchinson* suggests that if seller's actual damages were only $2,000, where the liquidated damages provision was for $100,000, equity would relieve against the forfeiture of the $100,000.

This rule was applied in *Bruce Builders, Inc. v. Goodwin*, 317 So.2d 868 (Fla.App. 1975). The result in that case, however, was that a liquidated damages amount of $7,200, on a $173,800 contract, (approximately 4%), was upheld. The nonbreaching seller had suffered no damages; in fact, it made a net profit of $2,500 on the lots which plaintiff-purchaser did not close on.

Very few Florida cases have fully applied the rule regarding relief from a forfeiture which only becomes apparent at the time of breach. Several have considered the initial relationship between contract price and deposit or liquidated damages amount and have decided that the liquidated damages provision was unconscionable on that basis alone. Those cases both pre-date and post-date *Hutchison*.

Absent any "intimation" of misfortune to the purchaser which created a windfall to the seller, the Florida Supreme Court in *Beatty v. Flannery*, 49 So.2d 81 (Fla.1950) did not find its conscience shocked by the retention of a $3,000 deposit on a $30,000 purchase price (10%). Liquidated damages of $1,500 on a $10,440 contract (over 14%) were not found shocking in *O'Neill v. Broadview, Inc.*, 112 So.2d 280 (Fla.App. 1959). Liquidated damages of $1,500 on a $31,500 purchase price (approximately 5%) were upheld in *Lewis v. Belknap*, 96 So.2d 212 (Fla.1957).

On the other hand, forfeitures of nearly 39%, in *Haas v. Crisp Realty Co.*, 65 So.2d 765 (Fla.1953), over 31%, in *Hook v. Bomar*, 320 F.2d 536 (5th Cir. 1963), and 50%, in *McNorton v. Pan American Bank of Orlando*, 387 So.2d 393 (Fla.App.1980), *pet. for rev. den.* 392 So.2d 1377, shocked the judicial conscience.

Of the cases which considered the actual damages to the non-breaching party, in *Mori v. Bomac Industries, Inc.*, 358 So.2d 47 (Fla.App.1978), the non-breaching lessor suffered no loss, but liquidated damages of $15,000 were upheld. But in *South Florida Regional Planning Council v. Board of County Commissioners of Palm Beach County*, 372 So.2d 1142 (Fla.App.1979), where the organization suffered no loss except a loss of prestige, the agreed provision that a withdrawing county pay the amount of one year's dues, $25,000, was held to be unconscionable. In *Secrist v. National Service Industries, Inc.*, 395 So.2d 1280 (Fla. App.1981), when the customer breached a service contract, liquidated damages for loss of profit, set at 10% of gross receipts of the contract for the unexpired term, were upheld. But the trial court's finding that an additional 30% in liquidated damages, designated as overhead, was unconscionable, was upheld because the evidence indicated that actual damages would not begin to equal that amount. In *Valenti v. Coral Reef Shopping Center, Inc.*, 316 So.2d 589 (Fla. App.1975) *cert. den.* 330 So.2d 727, the two vendors showed no actual damages, but liquidated damages of 7½% and 3½% were upheld.

■ In the case before this court, not only was there a contract for sale of real property in the "fluctuating" Florida land market, but the unique circumstances that

the subject property is a vacation time-share development, and the seller a reorganizing corporation, lead to the conclusion that damages were not ascertainable at the time the contract was drawn. The ratio of the value of the deposit ($121,000) to the contract price ($3,800,000) is approximately 3.2%, not so high as to shock the conscience of the court according to the Florida case precedents. In fact, the amount of the required deposit by purchaser was increased by the court at the time the contract was approved by the court, for the protection of the seller in just such an event as this. Although the value was later increased again by the parties because of the substitution of stock for cash, the additional amount was relatively small. The liquidated damages provision is valid.

Defendant has not shown that circumstances at the time of breach were such that the forfeiture, in retrospect, was unconscionable. The exact amount of plaintiff's damages was not proved, in part because they cannot be exactly known, which is the very reason liquidated damages clauses are utilized and are upheld. At the time this contract was approved by the court there were other potential purchasers inquiring, and two contracts which may well have culminated in a closing had this transaction not intervened. There is presently no other purchaser in view, and the property may well be lost in foreclosure, taking with it plaintiff's prospects for carrying out a plan. These circumstances are not such as to make a forfeiture by defendant unconscionable.

Stackel further makes the point that plaintiff was required to obtain, prior to closing, an adjudication of the validity of each time-share contract which Sombrero had disputed in the bankruptcy proceedings. That adjudication was not completed until many weeks after the original contract closing date and, in fact, occurred after the last date set for closing. Defendant asserts that this clause, including the date set for performance, is a material dependent covenant, and that by its failure to timely perform, Sombrero breached and cannot recover from Stackel.

A covenant is dependent where it is such an essential part of the bargain that the failure of it destroys the entire contract, and where the parties would not have entered into the contract without it. If a dependent covenant is breached, it is a breach of the entire contract and the injured party may seek damages or recission. *Steak House v. Barnett*, 65 So.2d 736 (Fla. 1953). Although Stackel and his witness testified that it was necessary to have the adjudication to provide information to the buyer's lenders, and to coordinate future time-share sales, when pinned down, they could not say that it was absolutely necessary to have the determination completed at closing, as opposed to a reasonable time shortly thereafter, and Stackel admitted that he had no concern about the result of the adjudication; in fact, a determination of *validity* of all of the disputed contracts would have given him a boost in his sales program. On the basis of these facts, the court concludes that the provision is not a material dependent covenant and plaintiff is not precluded from recovering by its failure to have the court complete the determination prior to the closing date.

Next, defendant asserts that plaintiff had waived any provision that time was of the essence in performance, and could not later declare that the time for Stackel to perform had expired, and place him in default. This is not an issue here. To this date, defendant has not performed and does not appear able to do so at any foreseeable time in the future.

Another defense Stackel has asserted is that plaintiff was without authority to enter into the second modification agreement because it dramatically changed the nature of the deposit required as well as extending the closing date, and that court approval of it was necessary. Both these changes were made at Stackel's request. Nevertheless, defendant asserts that plaintiff's failure to obtain court approval made the modification agreement a nullity, and thus plaintiff cannot rely on one term of it, (Stackel's representation that he had fi-

nancing,) as a basis for plaintiff's suit. This argument is not persuasive because a requirement for court approval is for the benefit of creditors of the estate, as well as the debtor-in-possession but not for a third party with whom the debtor-in-possession contracts, and the requirement cannot be raised by him to defeat a right the debtor-in-possession would otherwise have. Even more important, plaintiff's case does not depend on the legal validity of the modification agreement, but on the effect of a representation which happens to have been made in that document.

None of the defenses raised by Stackel is sufficient to defeat plaintiff's right to the deposit as liquidated damages.

Pursuant to B.R. 921(a), a separate Final Judgment in accordance with these Findings and Conclusions is being entered this date.